## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) Hitch Enterprises, Inc.; | ) |
| (2) David D. Duncan; and | ) |
| (3) Sagacity Inc., on behalf of | ) |
| themselves and all others similarly | ) |
| situated, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| (1) Cimarex Energy Co.; | ) |
| (2) Key Production Company, Inc.; | ) |
| (3) Magnum Hunter Production, Inc.; | ) |
| (4) Prize Energy Resources, L.P.; and | ) |
| (5) Gruy Petroleum Management | ) |
| Company (n/k/a Cimarex Energy | ) |
| Company of Colorado), | ) |
| | ) |
| Defendants. | ) |

**Case No. CIV-11-13-W**

### FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs bring this claim on behalf of themselves and the Class of all other persons similarly situated against Defendants and in support of these claims states as follows:

### NATURE OF THE ACTION

1.      Plaintiffs and the Class bring claims based upon Defendants' underpayment or non-payment of royalties on natural gas and/or constituents of the gas stream produced from wells in Oklahoma through improper accounting methods (such as starting with a price that is too low and then taking improper deductions) and by failing to account for and pay royalties, all as more fully described below.

### VENUE AND JURISDICTION

2.       Hitch Enterprises. Inc. is a family owned and operated entity, citizen of Oklahoma, and

royalty owner in Oklahoma wells owned in part or operated by one or more Defendants and paid

be Cimarex.

3.      This Court has jurisdiction under 28 U.S.C. § 1332(d), including removal jurisdiction

under CAFA.

4.      Venue is proper in the Western District of Oklahoma.

**PARTIES**

5.      Plaintiff Hitch Enterprises, Inc. has a royalty interests in the Hitch JR 1 -20 and the Hitch

Trust 2-29 wells in Texas County, Oklahoma. Key Production Company, Inc. holds the lease,

operates the well, and contracts with Cimarex Energy Co. to pay the royalty on these two wells

to Plaintiff Hitch Enterprises, Inc., which Cimarex Energy Co. does.

6.      Plaintiff David D. Duncan has a royalty interests in the Duncan Clarence 1-16 well in

Custer County, Oklahoma. Cimarex Energy Co. holds the lease, operates the well, and pays the

royalty on this well to Plaintiff David D. Duncan, which Cimarex Energy Co. does.

7.      Plaintiff Sagacity, Inc. is an Oklahoma corporation and has a royalty interests in the N.

Eola FBU 25-2 (Collins McKee 2-17); Howard C 2-17; Howard A 2-17; Cassel WA A-1; Cassell

D; Howard Unit B-1; Cassell C-1; Pease A 3-17; Eola North Fault Block Unit; Shirley 3; Howard

D-2; Pease A 3-23; Howard D 3-17; Cassell C 2-7H; Eola North FBU 26-4 (Dutton 4-16); Cassell

C 3-7; Howard D 4-17; and Howard D 5-18 in Garvin County, Oklahoma, and Madill North

Sycamore Unit C-1; Madill North Sycamore Unit C G-7; Madill North Sycamore Unit B-1; Madill

North Sycamore Unit B-2; Madill North Sycamore Unit B-3; Madill North Sycamore Unit A-2;

Madill North Sycamore Unit A-3; Madill North Sycamore Unit B-4; Madill North Sycamore Unit

A-5; Junkins Story Unit 1; Madill North Sycamore Unit B-5; Madill North Sycamore Unit C-3;

Madill North Sycamore Unit A-4; Madill North Sycamore Unit C-5; and Madill North Sycamore

Unit B-6 wells in Marshall County, Oklahoma. Prize and/or Magnum Hunter holds one or more

of the leases, CECOC operates one or more of these 32 wells, and Prize, Magnum Hunter, and

CECOC contract with Cimarex Energy to pay the royalty on these 32 wells to Plaintiff Sagacity

Inc., which Cimarex Energy Co. does.

8.    Defendants are as follows:

    a.    Cimarex Energy Co. ("Cimarex Energy") is believed to be a citizen of

Colorado where its corporate headquarters are located and a citizen of

Delaware where it is incorporated, and is doing business in the State of

Oklahoma. Cimarex Energy Co. has been served and appeared in this case.

Cimarex Energy Co. is in the business of producing and marketing gas and

constituent products from the wells in which Class members hold royalty

interests.

    b.    Key Production Company, Inc. ("Key") is believed to be a citizen of Colorado

where its corporate headquarters are located and a citizen of Delaware where

it is incorporated, and is doing business in the State of Oklahoma. Key

Production Company, Inc. can be served by serving process on its resident

agent Corporation Service Company, 115 SW 89th Street, Oklahoma City, OK

73139-8511.

    c.    Gruy Petroleum Management Company (n/k/a Cimarex Energy Co. of

Colorado, Inc.) ("CECOC") is believed to be a citizen of Colorado where its

corporate headquarters are located and a citizen of Texas where it is

incorporated, and is doing business in the State of Oklahoma. CECOC can be

served by serving process on its resident agent Corporation Service Company,

115 SW 89th Street, Oklahoma City, OK 73139-8511.

    d.   Prize Energy Resources, L.P. ("Prize") is a wholly owned subsidiary of Cimarex

Energy, and is a limited partnership with Prize Operating Co. as its general partner.

Prize can be served by serving its general partner through its resident agent

Corporation Service Company, 115 SW 89th Street, Oklahoma City, OK

73139-8511.

    e.   Magnum Hunter Production Inc. ("Magnum Hunter") is believed to be a

Texas company with its principal place of business in Colorado.  Magnum

Hunter can be served by serving its resident agent Corporation Service

Company, 115 SW 89th Street, Oklahoma City, OK 73139-8511.

    f.   Cimarex Energy, Key, CECOC, Prize, and Magnum Hunter will be

collectively referred to as "Cimarex" or "Defendants".

The Cimarex Family of Companies

9.    Cimarex Energy is the parent company of Prize, Magnum Hunter, CECOC, and Key, and

is sued herein as a lessee, operator, payor of royalty, and marketer of gas. [1]

10.    *The 2002 and 2005 Acquisitions*.   In 2002, Key was acquired and merged into Cimarex

Energy, and most of Key's management becoming the management of Cimarex Energy.

Between June 7-13, 2005, Magnum Hunter Resources, Inc. was acquired by and merged into

Cimarex Energy and out of existence, but after the merger, Magnum Hunter Production, Inc.

became a wholly-owned subsidiary of Cimarex Energy. At the same time, Prize Energy

Resources L.P. and Gruy were also acquired by Cimarex Energy because they were affiliated

companies of Magnum Hunter.

---

[1]  Cimarex Energy used a wholly owned subsidiary, Cimarex Energy Services Inc. (CESI), to
market gas until that company was phased out in 2005.

11.     CECOC operates over 400 Oklahoma wells, including the 32 wells and units in which Plaintiff Sagacity Inc. holds a royalty interest.  CECOC holds no Oklahoma leases, but operates all of the Oklahoma leases held by Prize and Magnum Hunter.  All of the CECOC operated wells have the royalties paid by Cimarex Energy.

12.     Prize and Magnum Hunter together hold 400 Oklahoma leases on which over 400 Oklahoma wells are operated by CECOC.  Prize and Magnum Hunter do not operate any Oklahoma wells (that is all done by CECOC) and do not pay royalty (that is all done by Cimarex Energy).   Prize and/or Magnum Hunter hold one or more of the leases on which Sagacity Inc.'s wells are located.

13.     Key holds Oklahoma leases, operates Oklahoma wells, but does not pay royalty (that is done by Cimarex Energy).

14.     Cimarex Energy holds Oklahoma leases, operates Oklahoma wells, markets gas from those wells, and pays royalty for gas from wells on its leases that it operates and markets.

15.     In Oklahoma, Cimarex Energy markets the gas and pays royalty for all of its subsidiaries—Prize, Magnum Hunter, Key, and CECOC—using the same methodology, same computer software, and same check stub forms.  However, until 2005, Cimarex Energy used another wholly owned subsidiary, Cimarex Energy Services Inc. (CESI) to market some or all of the gas for itself and its subsidiaries.

16.     Cimarex Energy uses "netback pricing" as the methodology to pay royalty owners.

17.     The acts charged in this Complaint as having been done by Defendants was authorized, ordered, or done by officers, agents, affiliates, employees, or representatives, while actively engaged in the conduct or management of Defendants' business or affairs, and within the scope of their employment or agency with Defendants.

18.     The written and oral agreements permit Cimarex Energy to function by using its subsidiaries as conduits as essentially one company, and all of the profits and losses of each subsidiary are coalesced into the parent company, Cimarex Energy.   To the extent the wholly owned subsidiaries, Prize, Magnum Hunter, Key, and CECOC, even have directors and officers, they are common to one another and common with Cimarex Energy.  For instance, Paul Korus is the Vice President for all of them. Cimarex Energy pays the salaries for most of the employees performing the marketing, accounting, and payment of royalty function for all of them.  Losses or profits of all of the subsidiaries are ultimately paid or owned by Cimarex Energy.  Most of the subsidiary's assets were originally merged into Cimarex Energy and then spun down into the subsidiary.  Cimarex Energy refers to the oil and gas businesses of these subsidiaries as its own group.  Cimarex Energy dominates and controls what these subsidiaries do with respect to Oklahoma oil and gas marketing and royalty payment.

### A.     Agency

19.     On July 24, 2003, Cimarex Energy entered into a Service Agreement with Key and on September 16, 2005, Cimarex Energy entered into a Service Agreement with Magnum Hunter Resources, Inc. and its subsidiaries (effective respectively October 1, 2002 and June 7, 2005).

20.     The Service Agreements are essentially the same and permit Cimarex Energy to act as an agent for Magnum Hunter, Prize and Key, and even without a written Service Agreement, it has the same agency relationship with Gruy and CECOC that allows Cimarex Energy to market gas and gas constituents from Oklahoma wells owned or operated by its subsidiaries and to pay royalty on such wells.

21.     Cimarex Energy elected officers and employees are appointed as attorney-in-fact for purpose of carrying out these duties for its subsidiaries.  Because these Service Agreements are deemed confidential, they are not attached to this pleading.

22.     The terms of this agency relationship and its existence are undisclosed to royalty owners. The agent and principal are both liable for the conduct of one another.

### B.     Joint Venturers

23.     Defendants are engaged in a joint venture to produce, market, and pay royalties, and receive revenues and profits from gas and gas constituents produced from Oklahoma wells.

24.     Regardless of any internal accounting, Cimarex Energy, as the parent company, annually receives the benefit of all of the revenue from its subsidiaries.

25.     As a result, the joint venturers are liable for the conduct of one another.

### C.     Alter Ego

26.     The Service Agreements and other unwritten agreements permit the Cimarex group of companies to operate as a unit with respect to the full production, including marketing and payment, of gas and gas constituents from Oklahoma wells.

27.     Cimarex Energy does, or certainly has the right to, control almost all of the financial decisions of its subsidiaries, such as budgeting, financial management, accounting and auditing, legal matters, administrative and engineering, matters relating to operations to produce, explore for, develop, treat, negotiate and lease, enter into unitization agreements, enter into marketing contracts, or gather gas, and anything else touching or concerning the affairs, business, interest or assets of the subsidiary.

28.     As a result, Cimarex Energy is responsible for all of the conduct of its subsidiaries.  In addition, under the Service Agreement, the subsidiaries agree to indemnify Cimarex Energy for

all of its conduct with relation to the subsidiary, and, as a result, the subsidiary is jointly

responsible for the conduct of Cimarex Energy.  In any event, the control or right to control

makes all of the subsidiaries in Cimarex Energy alter egos of one another.

**D.     Civil Conspiracy**

29.     In the unlikely event that the subsidiaries of Cimarex Energy sued herein are deemed to

be separate and distinct entities, the Service Agreements and other unwritten agreements

between them are agreements in which they engage in a civil conspiracy to short-change royalty

owners and are jointly and severally liable as civil conspirators.

## CLASS ACTION ALLEGATIONS

30.     Plaintiffs bring this action individually and, pursuant to Fed. R. Civ. P. 23 (a) and (b)(3),

as representatives of a Class defined as follows:

> All royalty owners in Oklahoma wells operated, leased, or paid by Cimarex
> Energy Co., Key Production Company, Inc., Prize Energy Resources, L.P. or
> Gruy Petroleum Management Company (n/k/a Cimarex Energy Co. of Colorado,
> Inc.), and/or Magnum Hunter Production Inc. that have produced gas and/or gas
> constituents (such as residue gas, natural gas liquids, helium, nitrogen, or
> condensate) from January 1, 1997 to the present.

> Excluded from the Class are: (1) the Mineral Management Service (Indian tribes
> and the United States); (2) Defendants, their affiliates, and employees, officers
> and directors; (3) Any NYSE or NASDAQ listed company (and its subsidiaries)
> engaged in oil and gas exploration, gathering, processing, or marketing; and (4)
> the gas production for those royalty owners paid under the *Lawrence v. Cimarex*
> settlement for gas production before September 1, 2005.

31.     The *Lawrence v. Cimarex Energy Co.* releases Cimarex Energy and its affiliated entities

before September 1, 2005, except for Magnum Hunter Resources Inc. and Magnum Hunter

Production Inc. which were specifically excluded from the *Lawrence v. Cimarex* settlement:

"Specifically excluded from this Settlement, the Release of Claims provided for herein, and this

definition are those interests acquired by CIMAREX through merger and/or acquisition of

Magnum Hunter Resources, Inc. and Magnum Hunter Production, Inc." *Lawrence* Settlement Section 1.11 defining CIMAREX.

32.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  For instance, Defendants have operated over 400 wells producing gas in Oklahoma and many more in which it holds a working interest, with at least one, and usually more, royalty owners for each well.  There are more than 5,000 royalty owners.  While many royalty owners remain in Oklahoma, many others reside in numerous other states, and perhaps countries. Defendants have within their possession or control records that identify all persons to whom it as paid royalties from wells located within Oklahoma from January 1, 1987 to present.

33.    The questions of fact or law common to Plaintiffs and the Class include, without limitation, one or more of the following:

> (a)    Whether Plaintiffs and the Class members are the beneficiaries of an implied covenant obligating Defendants to place the gas (and its constituents) from Class Wells into Marketable Condition;
> (b)    Whether Defendants are solely responsible for all costs necessary to render commercially marketable the gas and constituent parts produced under the oil and gas leases:
> (c)    Determining the point at which the gas (and its constituents) that Defendants produce becomes commercially marketable;
>> (i)  Whether Marketable Condition for residue gas occurs at transmission pipeline quality as Plaintiffs contend or earlier;
>> (ii) Whether Marketable Condition for NGLs occurs at fractionation quality as Plaintiffs contend or earlier; and
>> (iii) Whether Marketable Condition for helium occurs at Grade A quality as Plaintiffs contend or earlier;
> (d)    Whether Defendants deducted or allowed hired third parties to deduct (in cash or in kind) amounts for placing the gas (and its constituents) into Marketable Condition before paying royalty to Plaintiffs and the Class members.
> (e)    Whether Defendants paid royalty to Plaintiffs and the Class members based on a starting price below what Defendants received in arm's-length sales transactions;
> (f)    Whether Defendants paid royalty to Plaintiffs and the Class members for all gas constituents, such as condensate, nitrogen, and helium, produced from their wells.

(g)     Whether Defendants calculated the royalty paid to Plaintiffs and the Class according to the internal accounting, royalty payment formulas, and record-keeping operations of Defendants which are not known to or knowable by the members of the Class;

(h)     Whether the check stubs Defendants used in paying royalty to Plaintiffs and the Class members misrepresented or fraudulently concealed, by omission, commission or both, the true facts about Defendants' calculation of royalty owed;

(i)     Whether Defendants' payment of royalty to Plaintiffs and the Class members on a monthly basis is an open account;

(j)     Whether Plaintiffs and the Class members have the same legal claims to recover the above-described underpayments;

(k)     Whether Defendants' uniform practice of paying royalties under the oil and gas leases based upon the selling price of raw gas to third parties that gather, process, and deliver the gas to the commercial marketplace as opposed to the amounts received from the sale of the residue gas and other constituents in the commercial marketplace constitute a breach of Defendants' lease obligations to Plaintiffs and the Class members.

34.     Plaintiffs are typical of other Class members because Defendants pay royalty to Plaintiffs and other Class members using a common method.  Defendants pay royalty based on the net revenue Defendants receive under their marketing contracts.  The marketing contract terms are unknown to and unapproved by royalty owners.  The contracts are necessary to place the gas and its constituent parts into marketable condition.  Plaintiffs are also typical of the other Class members because their leases do not contain an express provision authorizing deductions of all of the gas conditioning costs to make the gas into marketable condition.

35.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are royalty owners paid by Defendants, understand their duties as Class representatives, and their interests in recovering for improper deductions do not conflict with the recovery of improper deductions by the Class.  Plaintiffs have retained counsel competent and experienced in class action and royalty owner litigation.

36.     This action is properly maintainable as a class action.  Common questions of law *or* fact exist as to all members of the Class and those common questions predominate over any questions

solely affecting individual members of such Class.  *See* ¶ 33 above.  There is no need for

individual Class members to testify in order to establish Defendants' liability or even damages to

the Class.

37.    Class action treatment is appropriate in this matter and is superior to the alternative of

numerous individual lawsuits by members of the Class.  Class action treatment will allow a large

number of similarly situated individuals to prosecute their common claims in a single forum,

simultaneously, efficiently, and without duplication of time, expense and effort on the part of

those individuals, witnesses, the courts and/or Defendants.  Likewise, class action treatment will

avoid the possibility of inconsistent and/or varying results in this matter arising out of the same

facts.  No difficulties are likely to be encountered in the management of this class action that

would preclude its maintenance as a class action and no superior alternative forum exists for the

fair and efficient adjudication of the claims of all Class members.

38.    Class action treatment in this matter is further superior to the alternative of numerous

individual lawsuits by the members of the Class because joinder of all members of those Class

would be either highly impracticable or impossible and because the amounts at stake for

individual Class members, while significant in the aggregate, are not great enough to enable

them to enlist the assistance of competent legal counsel to pursue their claims individually.  In

the absence of a class action in this matter, Defendants will likely retain the benefit of their

wrongdoing.

## GAS INDUSTRY BACKGROUND

39.    The members of the Plaintiff Class own interests in wells that produce gas and

constituent products that are subject to uniform accounting methods and to applicable implied

marketable product law which requires the lessee to bear all of the costs of placing the products, whether gas or its constituent parts, in "Marketable Condition".

40.     The lessee under an oil and gas lease has the duty to produce marketable products, and the lessee alone bears the expense in making all products marketable. Gas and its constituent parts are marketable only when in the physical condition to be bought and sold in a commercial marketplace.

41.     Only after a given product is marketable does a royalty owner have to pay its proportionate share of the reasonable costs to get a higher enhanced value or price for that particular product.

### The Lessor-Lessee Relationship

42.     The lessor owns minerals, including oil and gas, and the lessee has the money, labor, and know-how to extract, condition, and market those minerals. The lessor and lessee enter into a lease that allows the lessee to take the minerals from the lessor's land.  The usual revenue split from a well was $1/8^{th}$ to the lessor (royalty owner) and 7/8ths to the lessee.  As the risk of finding oil and gas has diminished over time, due to the prevalence of wells delineating the field, better seismic technology to find oil and gas, and drilling rigs becoming more efficient, royalty owners on more recent leases have received $3/16^{th}$ or even $1/4^{th}$ of the revenue   The oil and gas companies through undisclosed internal accounting practices have tried to keep as much of the well revenue as possible.  These accounting practices are at the heart of every oil and gas royalty owner case.

43.      Rather than adopting transparency in its royalty calculation formula, Defendants, like most lessees, has guarded its production and accounting processes as confidential or proprietary, thereby, depriving the royalty owners of critical information.  Consequently, the royalty owner is

unaware of the lessee's actual practices which enable the lessee to breach the oil and gas lease without accountability. Amazingly, these one-sided, half-century long deals can never (as a practical matter) be breached by the royalty owner. So the lessee can breach, and if caught, can force a settlement for only a small percentage of what it should have paid in royalty, thus making the breach profitable.

44.    If after years one or more of the royalty owners learn of the "breach", the royalty owner has only 3—all poor—options: (1) confront the lessee and maybe get paid while the lessee continues to retain improperly garnered gas revenues from thousands of other unknowing royalty owners; (2) do nothing since it only results in a modest yearly loss to them and individual litigation is too expensive to pursue for that; or (3) file a class action lawsuit which will last for years and may still not recover the full loss. In short, if lessee breaches, it may never be held accountable, and if a royalty owner complains, the lessee may still come out ahead. The class action is the best of the options, hence this suit.

### Residue Gas, Helium, Nitrogen, and Natural Gas Liquids Production

45.    The gas is gathered from each well, dehydrated and compressed, through gathering lines that are buried underground and cross many miles of land. The three primary well gas products-- methane, natural gas liquids ("NGLs"), and helium--are further processed at processing plants before being trucked or piped to the commercial market and on to the end-user.

### Wellhead (Basic Separation and Gas Measurement)

46.    The diagram below illustrates the gas conditioning process.



Wells produce oil, gas, and a host of other products, such as water, helium, nitrogen, etc, all mixed together in the gas stream.[2]  After the stream comes out of the ground, it enters the free water knockout (a/k/a three-phase separator) which separates the products by gravity, water at the bottom, oil in the middle, and gas going out the top.  Due to the low technology, the separator is not expensive (the "separation cost").  The gaseous mixture (with helium, nitrogen, NGLs, and other gaseous substances) passes from the separator into the gas line.[3]  The remaining fluid goes through the heater-treater where heat, gravity segregation, chemical additives and electric current

[2]     Hydrocarbons can vary in chemical makeup (from simple methane to complex octane) and in form (from a pure gaseous state to liquid condensate).  The non-hydrocarbon makeup of the well-stream that includes natural gas can also include gases such as helium, sulfur, carbon dioxide and nitrogen.  This mixture of many gaseous elements and substances is often referred to as the "gas stream" or just "gas".

[3]     A minute portion of this raw or mixed gaseous product may be used on the leased land to heat the farm house pursuant to a free gas clause in the lease or sometimes sold to a small, limited local market with a finite demand to local irrigators near the wellhead.  This limited local market accounts for less than 5% of a producer's gas production.

break down the mixture more clearly into oil and water.  The heater-treater is installed,

maintained and takes fuel to operate (the "heater-treater cost").  The water is drained off and sent

for salt water disposal.  The oil that is separated at the wellhead is collected in a tank, usually

trucked out and sold. [The payment of oil royalties is not at issue in this lawsuit.]

47.     Since the pressure of many wells has depleted over the decades of production, sometimes

wellhead compressors have been installed to suction gas out of the well or just to move the

gaseous mixture.  These wellhead compressors are installed, maintained and use fuel (the

"wellhead compression" or "vacuum compression" cost).  The gaseous mixture produced from a

single well cannot be processed economically, so the mixtures are 'gathered' together through

gathering lines and the aggregate mixture is put through a processing plant.  *See*

http://www.kgs.ku.edu/Publications/Oil/primer13.html



**Gathering Lines (Dehydration, Compression, Condensate)**

48.     As the gaseous mixture from each well enters the gathering line it is measured, both

volume (in Mcf) and in quality (Btu content) (combined, "gas measurement" done in MMBtu).

This is done in a meter run which must be constantly maintained to preserve accuracy (the

"measurement cost").  Gathering pipelines are made of metal that could be corroded by any

remaining water vapor (and other corrosive gases) in the gaseous mixture, so a glycol dehydrator

is used to remove the water vapor ("dehydrator cost"). Of course, gas cannot move unless it is

pressurized, so large gas compressors are installed to move the gas down the gathering line.  The

gas must be pressurized high enough to overcome the back-pressure in the line and friction.

These compressors are expensive and require fuel to operate (together, "gathering or field

compression fee" and/or "gathering fuel").  The gathering pipelines themselves cost money to

lay and maintain ("gathering cost").  Gas condensate (gas condensed into liquid as it cools) is

collected at points along the gathering lines as a result of cleaning or "pigging the line"

("Condensate"), and is captured for fractionation later.  Finally, gathering lines leak, especially

as they age, resulting in lost and unaccounted for gas ("L&U").

### Natural Gas Processing

49.     Once the gas mixture is gathered from a sufficient number of wells (and often from

multiple gathering systems), it enters the inlet of the processing plant.  To process the gas into

methane, crude helium, and mixed NGLs, lessees, such as Defendants, use gas processing plants.

Sometimes the processing plant is owned by an unrelated third party and sometimes it is owned

in whole or in part by lessees.  Sometimes other impurities in the mixture must be removed such

as carbon dioxide, nitrogen, or sulfur (the "treatment cost").  Methane gas (sometimes called

"residue gas") must meet the quality standards for long-haul pipeline transmission set by the

Federal Energy Regulatory Commission (FERC) which is called "pipeline quality gas".  NGLs

are used as a feedstock in the petrochemical and oil refining industries, and are worth more than

methane.  NGLs are separated from the gaseous mixture by cooling the mixture until the NGLs

become separated.  This cooling or Cryogenic recovery method usually takes place at

temperatures lower than minus 150°F (the "Cryogenic or cooling process").  The mixture of NGLs is further moved down a liquids pipeline and processed by a fractionator for separation of the NGLs into their component parts ("T&F" or "fractionation"). Helium is processed into a crude mixture known as "raw helium" or "crude helium".  Raw helium contains impurities and must be further processed into Grade A helium for commercial sale and use. This total processing system involves expensive equipment and requires fuel to operate (collectively, the "processing charge" and/or "plant fuel").

50.     At the tailgate of the processing plant, at least four products emerge: (1) crude helium; (2) residue gas (or methane gas); (3) NGLs (usually a mixture of NGLs, known as "raw make" or "Y" grade); and (4) nitrogen and other products.  None are commercially marketable at that point.

### Marketable Condition for the Products

51.     *Helium*.  Crude helium (about 50%-80% pure) has little commercial use; instead, it has to be further processed into Grade-A helium (99.9% pure).

http://minerals.usgs.gov/minerals/pubs/commodity/helium/heliumcs05.pdf  The crude helium from the processing plant is then piped to one of the Grade A helium processing plants.

52.     Helium is an element.  Helium has no Btu content, and will not burn.  Helium is found in the natural gas stream but is not itself natural gas.  Helium is an increasingly valuable product.

http://www.jbs.cam.ac.uk/programmes/phd/downloads/conference_spring2007/papers/cai.pdf ("Eventually we expect helium prices to be sufficient to motivate gas extraction from wells where the helium is the primary product and other gases, such as natural gas and carbon dioxide, would form a by-product.").  The gas streams from Plaintiffs' wells and those of other Class members contain helium.  Helium is extracted at the processing plants, but Defendants do not pay royalty at all, or not completely, on the helium from Plaintiffs' and Class members' wells.

53.     *Methane Gas*.  Methane gas (or residue gas) is commercial quality (a/k/a "pipeline quality") at the tailgate of the processing plant only after it is further pressurized to enter the transmission line by a booster compressor (the "booster compression" cost) .

54.     *NGLs*.  The raw mixture of NGLs at the tailgate of the processing plant is not commercially marketable.  It must be fractionated into commercially marketable products—ethane, propane, butane, isobutane, natural gasoline, etc.  *See*, http://ngl.conocophillips.com/news/about.htm.  Defendants improperly deduct, in computing royalty for NGLs, processing fees and/or other costs (such as transportation and fractionation, T&F) needed to reach commercially marketable fractionated NGLs.  Such deductions are improper.

55.     *Nitrogen and other Products.*  Nitrogen is produced and processed without payment of royalty, and Plaintiffs and Class members are entitled to royalty on nitrogen produced from their wells and used or sold.  The same is true of other products, such as Condensate which falls out from cooling on the gathering line.

### Sale of Products

56.     To turn the gas products into money, the producer then sells the products.  One would expect that such sales would occur in the commercial market place in an arm's length transactions.  That, in fact, occurs, but lessees attempt to cover up and manipulate that fact by self-serving language in marketing contracts about title transfers or even by creating wholly owned affiliates to manufacture a fictitious "sale" before the gas reaches commercial quality for sale.

57.     The "starting price" for gas products is most often established by the lessee through a "weighted average sales price" or an "index price".  If Defendants have the market power to,

over time, obtain above "index price" in its arm's length sales, then as an agent for the royalty owner, the royalty owner is entitled to this higher price over time as well.

      a.    *Affiliated Service Companies May Be Used Before The Products Are Placed In Marketable Condition.*

58.    Some lessees contract with affiliated gathering companies or other affiliated gas service providers before the products (residue gas and/or NGLs) are in Marketable Condition in an effort to: (1) artificially, and improperly, create a commercial market where none truly exists in order to justify deducting costs from, or not even paying for, the gas or constituent products to royalty owners; (2) charge "marketing fees" to royalty owners through affiliates even though the lessee is already obligated under the lease to market the gas and constituent products; and/or (3) pay on the lower lessee/affiliate sale price not the higher affiliate/third party price.

      b.    *Affiliated Marketing Companies May Be Used After Products Are Placed in Marketable Condition.*

59.    The "weighted average sales price" involves a pool of sales transactions to third parties (and/or affiliates) and combines the prices paid by those third parties (and/or affiliates) to arrive at a "weighted average sales price".  Lessees can manipulate this process by using lower lessee/affiliate sales prices for part of the pool price, rather than all third party arm's length sale prices.

## Different Ways Defendants Underpay Royalty Owners

60.    The extraordinarily large dollars at stake and the one-sided nature of the gas lessor-lessee relationship are constant temptations to lessees to wrongfully retain gas revenues.  All payment formulas, affiliate and non-affiliate contractual relationships, and all calculations are exclusively in the control of lessees, *and* they involve undisclosed accounting and operational practices.  As a result, there are many ways royalty owners are underpaid on their royalty interests, and they

never know it.  The common thread through all of these schemes is that they are typically buried in the internal lessee accounting systems or royalty-payment formulas.

61.     Defendants represent the royalty calculation on the form of a monthly check stub it sends each royalty owner.   The check stub shows each royalty owner's interest (which is not in dispute here), and volume, price, deductions, value, and taxes, all of which are at issue in this case.

62.     Defendants underpay Plaintiffs and the Class in one or more of the following ways, without limitation:

(a)     <u>Helium</u>.  Helium is contained in the well-stream produced from Plaintiffs' and most Class members' wells, but Defendants: (i) fails to pay royalty for all of the helium produced (some is lost and unaccounted for in the gathering process); (ii) deducts processing fees and costs even though the helium is not yet in commercial grade; (iii) pays at a lower than commercial Grade A price; and (iv) deducts a helium severance tax that is not owed.

(b)     <u>Condensate</u>.  Plaintiffs' and Class members' wells produce heavy hydrocarbons that condense in the pipeline and are recovered by Defendants (or on behalf of Defendantss by its gatherers), but Defendant fail to pay *any* royalty for that Condensate. Some of this failure to pay may be accomplished by use of an affiliate.

(c)     <u>Natural Gas Liquids (NGLs)</u>.  Defendants: ( i) fail to pay royalty for all of the NGLs produced (some is lost and unaccounted for in the gathering process); (ii) deduct processing fees and expenses; iii) and reduce payment by T&F all before obtaining commercially marketable fractionated NGLs.  NGLs should be paid on a fully fractionated basis and only on arm's length sales. Some of this failure to pay may be accomplished by use of an affiliate.

(d)     <u>Residue Gas.</u>

(i)      The starting price paid for residue gas may be improper as affiliate sales to an affiliate, instead of an arm's length, third party sale price;

(ii)     The volume paid to royalty owners and reflected on their check stubs is less than is the volume actually produced from the wells because, among other things, Defendants improperly deduct in-kind gas used in gathering and processing, and lost gas in the gathering line;

(iii)    Deducting (in cash or in-kind) costs for placing the gas in Marketable Condition, such as gathering, treating/conditioning, dehydration, compression, processing, or other deductions is improper;

(e)     <u>Nitrogen and Other Products</u>.  Defendants fail to account and pay royalties on nitrogen or other products that are used or sold and obtained from Class members' wells.

## DISCOVERY RULE, FRAUDULENT CONCEALMENT, EQUITABLE ESTOPPEL, AND CONTINUOUS CONDUCT

63.    Plaintiffs and the Class incorporate by this reference the allegations in paragraphs 1- 42.

64.    The royalty account for each royalty owner was an open account in that each monthly payment was subject to correction and Defendants have made prior period adjustments for years. Since the payment of royalties to royalty owners are open accounts, limitations does not begin to run at all (or is tolled) until the final payment on such account has been made, i.e. after the well has ceased production and a final payment has been made.

65.    Throughout the Class Period, Defendants undertook to represent to Plaintiffs and Class members on a monthly basis on their check stubs that a proper accounting had been made, but through a series of common omissions and misrepresentations, in fact Plaintiffs and the Class did not receive a proper accounting.

66.     Defendants also carried out its internal practices without disclosing that Defendants were underpaying Plaintiffs and the Class by an amount less than the full and appropriate royalty owner payments.

67.     Throughout the Class Period, the only accounting provided by Defendants to royalty owners on a monthly basis is contained in the check stubs which come to royalty owners in Oklahoma wells using the same check stub format and the same check stub software that, unbeknownst to royalty owners, fails to disclose and affirmatively misrepresents the price, quantity, value, and deductions.  Defendants represent a price which is lower than the price it receives from third party arm's-length sales because Defendants permits deductions from royalty based on marketing contracts which royalty owners do not know about and do not participate in making.  These deductions go both to price and to volume.  Consequently, when the Defendants' check stub reflects nothing in the "gross deducts" column, that is false.  Likewise, when it represents a gross quantity, that is not the measured wellhead volume but something less.   And, the "price" is not a real price.  Instead, the "price" is a calculated number that secretly reflects deductions or reductions.  And, further, the "price" does not disclose that Defendants are not putting NGLs, Condensate, and/or Helium into marketable condition but is often giving those away as part of a gathering or processing contract or taking or allowing undisclosed deductions in those cases where it does pay something for constituents of the gas stream other than residue gas.  Consequently, the gross value is also incorrect and low. In short, the check stub fraudulently conceals the actual volume, price, and deductions taken from royalty owners Further, the "volume" on the check stubs fail to disclose that Defendants have failed to put all components of the gas stream into marketable condition at its sole cost, but, instead, that volumetric deductions or reductions are allowed to reduce royalty amounts and that components

of the gas stream are reduced as a result of fuel, and lost and unaccounted for gas (FL&U) as well as plant fuel or percentage of products paid for which result in underpayment without disclosure to royalty owners as to what is deducted or how much.

68.     Because of Defendants' misrepresentations, omissions, and/or general scheme to conceal its underpayments, Plaintiffs and the Class did not become aware, and could not have become aware through the exercise of reasonable diligence, that such schemes were in existence.  The only way to know was for Defendants to disclose their royalty payment methodology, i.e. a netback pricing scheme based on deductions set forth in a gas marketing contract, which were confidential and could not, would not, and were not disclosed to royalty owners.  Unbeknownst to Plaintiffs in this suit, royalty owners in Kansas, in which Cimarex uses the same royalty payment methodology, asked for information about deductions being taken, and was erroneously told by Mike Hart (a deponent in this case) that no improper deductions were being taken.  Thus, requesting such information from Cimarex to disclose its own improper conduct, not surprisingly, was and is a useless act.  Therefore, Plaintiffs and the Class are entitled to toll the applicable statutes of limitations, based upon the doctrines of fraudulent concealment (Plaintiffs also allege actual fraud, deceit, and constructive fraud which also tolls the statute of limitations), discovery rule, continuing conduct, and estoppel.

69.     Plaintiffs learned of these common misrepresentations on their check stubs after establishing an attorney-client relationship with the undersigned attorneys and less than a month before filing or joining this suit.

## COUNT I—BREACH OF LEASE

70.     Plaintiffs and the Class incorporate by this reference the allegations in paragraphs 1- 69 and 75-125.

71.     Plaintiffs and the Class entered into written, fully executed, oil and gas leases with Defendants, and those leases include implied covenants requiring Defendants to place the gas and its constituent parts in "Marketable Condition" at Defendants' exclusive cost.  The leases also place upon Defendants the obligation to properly account for and pay royalty interests to royalty owners under the mutual benefit rule.

72.     At all material times, Plaintiffs and the Class have performed their terms and obligations under the leases.

73.     Defendants breached the implied covenant of the leases by its actions and/or inactions.

74.     As a result of Defendants' breaches, Plaintiffs and the Class have been damaged through underpayment of the actual amounts due.

## COUNT II—UNJUST ENRICHMENT

75.     Plaintiffs and the Class incorporate by this reference the allegations in paragraphs 1-74, and 78-125.

76.     Defendants received the benefit of or retained monies due and owing to Plaintiffs and the Class.  Defendants were thereby able to use for their own purpose monies that in equity and good conscious, and as a matter of law, belonged to royalty owners.

77.     The existence and ongoing retention of these monies by Defendants affected an immediate and measurable increase in Defendants' cash, revenue, and profits.

78.     Defendant's retention of such monies is unjust and unwarranted for all of the reasons set forth herein and damaged Plaintiffs and the Class.  Additionally, Defendants are liable for the profits it made from the unlawful and improper retention and use of monies that should have been paid to Plaintiffs and the Class.

## COUNT III---ACCOUNTING

79.     Plaintiffs and the Class incorporate by this reference the allegations in paragraphs 1- 78 and 81-125.

80.     Plaintiffs and the Class seek an equitable accounting of such monies and a disgorgement of such monies, including recovery for monies wrongfully retained at the highest interest rate allowed by equity whether that be at Defendants' internal rate of return or some other rate under applicable case law or equitable principles.

### COUNTS IV, V, AND VI---FRAUD, DECEIT, AND CONSTRUCTIVE FRAUD

81.     Plaintiffs and the Class incorporate by this reference the allegations in paragraphs 1- 80 and 103-125.

82.     The majority of royalty owners in the class are from Oklahoma.  So the uniform misrepresentations and/or omissions on the monthly check stubs were made primarily in Oklahoma and acted upon primarily in Oklahoma.

83.     The wells involved in this case are entirely within the State of Oklahoma, and many of those wells involve unitization for secondary recovery and/or drilling and spacing units pursuant to Oklahoma law.

84.     Defendants' uniform misrepresentations and/or omissions on the check stubs all pertained to Oklahoma wells.

85.     Defendants did business associated with production of the oil and gas in Oklahoma.

86.     The oil and gas products were produced exclusively from Oklahoma wells, from Oklahoma's energy reservoirs, and primarily gathered in and processed in Oklahoma.

87.     The class members received standardized written misrepresentations and/or omissions as set forth above.

88.     More Oklahoma citizens in the Class relied on the monthly check stubs that contained

misrepresentations and/or omissions than in any other state.

89.     The source of the underpayments and deductions are gas marketing contracts (sale,

gathering, or processing) that pertain exclusively to gas and constituents from Oklahoma

reservoirs and are for gas conditioning services that occur almost exclusively in Oklahoma.

Although the accounting for these Oklahoma gas marketing contracts is done at Defendants'

home office, the source of all of the numbers (and resulting misrepresentations) originate

primarily from Oklahoma.

90.     The monthly check stubs themselves are and were a failed, false, and fraudulent attempt

to comply with the Oklahoma check stub law and failed to accurately account to Plaintiffs and

the Class.

91.     The gas products involved in this case originate from Oklahoma wells, which both class

members and Defendants were well aware and all of the gas products were pumped entirely from

within the boundaries of Oklahoma.  Upon their lifting from the ground, the gas and constituent

products became tangible personal property collected and sold from Oklahoma reservoirs.

92.     As set forth above, Defendants made a material representation that was false and/or

omitted to state one or more material facts needed to make what was stated not misleading.

Defendants knew when the material representations were made on the check stubs that they were

false or misleading and/or at least made it recklessly without any knowledge of its truth, or made

it with the intent that Plaintiffs would rely on it.  Plaintiffs did rely on and/or are legally

presumed to have relied upon these uniform written representations as being truthful and

accurate, when they were not, and Plaintiffs and the Class members suffered injury and were

underpaid as a result.

93.     Defendants also concealed or failed to disclose facts about the price, volume, value, various products produced, and deductions, which Defendants had a duty to disclose to avoid presenting half-truths or misrepresentations.

94.     Defendants undertook the duty to properly account by making the statements in the check stubs on a monthly basis to royalty owners.  By speaking on the issue, Defendants had a duty to make full and fair disclosure of all relevant facts.  This is especially so because Defendants had superior and/or specialized knowledge and/or access to information as compared to the royalty owners.

95.     Defendants knew that their representations or omissions on the monthly check stubs were at least ambiguous and created a false impression of the actual facts to the royalty owners.

96.     Defendants knew the facts were peculiarly within the Defendants' knowledge and that the royalty owners were not in a position to discover the facts pertaining to the proper volume, values, and constituents coming from their wells.  Accordingly, having spoken on the subject matter, Defendants had a duty to make full and fair disclosure of all material facts such that its statements were not misleading and did not fail to state material facts necessary to make the statements made not misleading.

97.     Defendants were deceitful by suggesting, as a fact, that the volume, price, value, and other statements were as set forth on the check stubs monthly but which was not true and Defendants knew they were not true, had no reasonable grounds for believing they were true, or gave only such information as was likely to mislead for want of the communication of the non-disclosed facts.

98.     The misrepresentations and omissions were intentionally made and were intended to suggest that the price was a third party commercial price without hidden deductions, the volumes

were accurately measured without volumetric deductions, and that deductions would be shown

on the check stub when in fact they were not.

99.     Defendants have fraudulently and deceitfully misled the Class into believing that they

had been paid on the full value of the production from their Oklahoma wells by falsifying and

creating misleading check stubs sent to the Class.

100.    Defendants acted intentionally or recklessly in disregard for the rights of Plaintiffs and

the Class members by not properly paying royalty owners, by deceiving them with check stubs

that were misleading, and by not correcting Defendants' royalty payment practices after *Johnson*

*v. Jernigan* (1970), *Wood v. TXO* (1992), *TXO v. State* (1994), *Garman v. Conoco* (CO 1994),

*Sternberger v. Marathon Oil* (KS 1995), and *Mittelstaedt v. Santa Fe Minerals Inc.* (1998) such

that punitive damages in the amount of actual damages awarded should be awarded under 23

O.S. §9.1(B)(2)(b) and that Defendants acted intentionally and with malice toward Plaintiffs and

the Class members subjecting Defendants to punitive damages in the amount of double actual

damages under 23 O.S. §9.1(C)(1)(b).

101.    The money wrongfully obtained by Defendants as a result of what should have been paid

to Plaintiffs and the Class should be held in constructive trust along with moratory interest for

Plaintiffs and the Class.

102.    As a direct and proximate result of Defendants' fraud deceit, and constructive fraud,

Plaintiffs and the Class members are entitled to recover both actual and punitive damages from

Defendants, as well as pre-judgment interest, post-judgment interest, attorneys' fees, expenses,

and costs and such other relief as permitted by Oklahoma law.

## <u>COUNT VII-BREACH OF FIDUCIARY DUTY</u>

103.    Plaintiffs and the Class members incorporate by this reference the allegations in

paragraphs 1- 102 and 112-125.

104.    Plaintiffs and the Class members have wells that have unitized under 52 O.S. §§ 287.1-287.15 and/or 52 O.S. § 87.1.

105.    Defendants have a fiduciary duty as a result of the above mentioned statutes, the Oklahoma Corporation Commission (OCC) orders made pursuant to those statutes, and/or the unitization order and agreement with Plaintiffs and the Class members based on field-wide units or secondary recovery under 52 O.S. §§ 287.1-287.15 and also by the creation of drilling and spacing units under 52 O.S. § 87.1.

106.    Defendants are the unit operator by appointment from the Oklahoma Corporation Commission for Plaintiffs' wells and the Class members.

107.    Defendants owe a fiduciary duty to Plaintiffs and the Class members under the Oklahoma Production Revenue Standards Act, 52 O.S. § 570.10(A).

108.    Defendants breached their fiduciary duty to Plaintiffs and the Class members by failing to properly report, account for, and distribute gas proceeds to Plaintiffs and the Class members for their proportionate royalty share of gas production.

109.    If the statute of limitations applies at all to an open account and is not tolled as set forth above, the statute of limitations is not even triggered for breach of fiduciary duty in this case because Plaintiffs and the Class members did not know and could not have known of Defendants' failure to make proper payments which was based solely on accounting information in the hands of Defendants.

110.    Defendants' conduct in breaching its fiduciary duties to Plaintiffs and the Class members was done intentionally, maliciously, or in reckless disregard for the rights of Plaintiffs and the Class members.

111.    As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiffs

and the Class members are entitled to recover both actual and punitive damages from Defendants,

as well as pre-judgment interest, post-judgment interest, attorneys' fees, expenses, and costs, and

such other relief as permitted by Oklahoma law.

## COUNT VIII - TORTIOUS BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING IN THE LEASE

112.    Plaintiffs and the Class members incorporate by this reference the allegations in

paragraphs 1- 111 and 118-125.

113.    Defendants, as set forth above, owed a fiduciary duty, quasi-fiduciary duty,  and/or a

special relationship to Plaintiffs and the Class as well as an implied duty of good faith and fair

dealing in every lease.

114.    Defendants have never repudiated its fiduciary or quasi-fiduciary duty to the Plaintiffs or

the Class or its special relationship.  In fact, Defendants' actions have reinforced the existence of

such a duty since they totally controlled royalty payments and the Plaintiffs and the Class was

forced to put faith and trust in Defendants.  Defendants knew that the Plaintiffs and the Class had

no option but to trust Defendants to properly account for and pay royalty.

115.    Defendants' actions are and have been more than a simple breach of lease.  Implied into

every contract and lease is the duty to deal honestly and fairly.

116.    Defendants are liable for tortious breach of lease resulting in damages to the Plaintiffs

and the Class for failing to deal honestly and fairly.

117.    As a direct and proximate result of Defendants' breach of duty, Plaintiffs

and the Class members are entitled to recover both actual and punitive damages from Defendants,

as well as pre-judgment interest, post-judgment interest, attorneys' fees, expenses, and costs, and

such other relief as permitted by Oklahoma law.

## COUNT IX - TORTIOUS BREACH OF LEASE

118.    Plaintiffs and the Class members incorporate by reference the allegations in paragraphs 1-117 and 122-125.

119.    The duties imposed by the lease, operator statutes and OCC orders, and PRSA require that the royalty accounting, payment, and reporting be done with care, skill, and faithfulness, but Defendants have not only failed to do so, but have knowingly and/or intentionally failed to do so constituting a tort in the performance of the lease and royalty payment process and obligation.

120.    Defendants are liable for the tortious breach of the lease in the performance resulting in damages to the Plaintiffs and the Class.

121.    As a direct and proximate result of Defendants' tortious breach of the lease, Plaintiffs and the Class members are entitled to recover both actual and punitive damages from Defendants, as well as prejudgment interest, post judgment interest, attorneys' fees, expenses, and costs, and such other relief as permitted by Oklahoma law.

## COUNT X – CONVERSION

122.    Plaintiffs and the Class members incorporate by reference the allegations in paragraphs 1 – 121.

123.    Pursuant to 52 O.S. §570.10(A), the proceeds of the sale of oil and gas attributable to a royalty owner's interest are considered specifically identifiable monies owned by the royalty owner and held in trust for him by Defendants and may be the subject of conversion.

124.    By failing to properly pay Plaintiffs and the Class members for royalty, Defendants are liable for conversion.

125.    As a direct and proximate result of Defendants' conversion, Plaintiffs and the Class members are entitled to recover both actual and punitive damages from Defendants, as well as

pre-judgment interest, post-judgment interest, attorneys' fees, expenses, and costs and such other relief as permitted by Oklahoma law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for an Order and Judgment against Defendants as follows:

a.        Certifying this action pursuant to Fed. R. Civ. P. 23 (a) and (b)(3) as a class action, appoint Plaintiffs as Class representatives, and Plaintiffs' Counsel as Class counsel with reasonable notice to be given to members of the Class;

b.        Awarding Plaintiffs and the Class members damages from Defendants' breach of lease and unjust enrichment, including but not limited to disgorgement, interest at the highest allowable rate (such as lawful, equitable, or internal rate of return), compensatory damages, and punitive damages for fraud, deceit, constructive fraud, breach of fiduciary duty, and breach of the implied duty of good faith and fair dealing;

c.        Granting Plaintiffs and the Class the costs of prosecuting this action together with reasonable attorney's fees , expenses, and costs out of the recovery;

d.        Granting an accounting of underpayments, non-payments, and wrongful deductions regarding Plaintiffs and the Class; and,

e.         Granting such other relief as this Court may deem just, equitable and proper.

## JURY DEMAND

Plaintiffs and the Class demand trial by jury regarding all issues that can be tried to a jury under applicable law.

## ATTORNEYS' LIEN CLAIMED.

/s/ Rex A. Sharp
Rex A. Sharp OBA#011990
Gunderson, Sharp & Walke, L.L.P.
5301 W. 75th Street
Prairie Village, KS  66208
(913) 901-0500
(913) 901-0419 fax
rsharp@midwest-law.com

Jon K.Parsley OBA#16289
Jon K. Parsley PLLC
112 NE 4th Street
Guymon, OK 73942
(580)-338-8764
jparsley@ptsi.net

## CERTIFICATE OF SERVICE

On May 27, 2011, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:  ndavis@swlaw.com, jkilroy@swlaw.com, jyates@swlaw.com and bwelsh@gablelaw.com.

/s/ Rex A. Sharp